1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF ARKANSAS

EL DORADO DIVISION

---

REID HUMPHREY, *
                                   *
    Plaintiff,                     *
Versus                             *   Case No.
                                   *   1:13-CV-01029
                                   *   SOH
SCOTT SNELL, IN HIS INDIVIDUAL AND *
OFFICIAL CAPACITIES; DARREN        *
MARTIN, IN HIS INDIVIDUAL AND      *
OFFICIAL CAPACITIES; STEVE ADAMS,  *
IN HIS INDIVIDUAL AND OFFICIAL     *
CAPACITIES; RICKY ROBERTS, IN HIS  *
INDIVIDUAL AND OFFICIAL CAPACITIES;*
BILLY WHITE, IN HIS INDIVIDUAL AND *
OFFICIAL CAPACITIES; THE EL DORADO *
POLICE DEPARTMENT; THE CITY OF EL  *
DORADO, ARKANSAS,                  *
                                   *
    Defendants.                    *

---

DEPOSITION OF REID SCOTT HUMPHREY
OCTOBER 22, 2013

---

TAKEN BEFORE Teresa L. Hollingsworth, Certified Court Reporter, Certificate No. 537, Bushman Court Reporting, 620 West Third Street, Suite 101, Little Rock, Arkansas, on October 22, 2013, at the offices of the Depper Law Firm, 101 West Main Street, Suite 200, El Dorado, Arkansas commencing at 1:45 p.m.

BUSHMAN COURT REPORTING
BLITTLE ROCK, ARKANSASG

DEFENDANT'S
EXHIBIT

APPEARANCES

FOR THE PLAINTIFF:

    ROBERT L. DEPPER, JR., ESQUIRE
    DEPPER LAW FIRM
    101 WEST MAIN STREET
    SUITE 200
    EL DORADO, ARKANSAS 71730

FOR THE DEFENDANTS RICKY ROBERTS, BILLY WHITE, AND THE EL DORADO POLICE DEPARTMENT, AND THE CITY OF EL DORADO, ARKANSAS:

    AMANDA LAFEVER, ESQUIRE
    ATTORNEY AT LAW
    POST OFFICE BOX 38
    NORTH LITTLE ROCK, ARKANSAS 72115

FOR THE DEFENDANTS SCOTT SNELL, DARREN MARTIN AND STEVE ADAMS:

    KEITH WREN, ESQUIRE
    ATTORNEY AT LAW
    9421 WEST MARKHAM STREET
    SUITE B
    LITTLE ROCK, ARKANSAS 72205-2282

ALSO PRESENT:

    RICKY ROBERTS
    BILLY WHITE

1 INDEX

2

3  Examination by Ms. LaFever .................... 5
4  Examination by Mr. Wren ...................... 42
5  Examination by Ms. LaFever ................... 82
6
7
8  Certificate Page ............................. 88

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  ANSWERS AND DEPOSITION OF REID SCOTT
2  HUMPHREY, a witness produced at the request of
3  Defendants, taken in the above styled and numbered
4  cause on October 22, 2013, before Teresa L.
5  Hollingsworth, Certified Court Reporter,
6  Certificate No. 537, a Notary Public in and for
7  Pulaski County, Arkansas, taken at the offices of
8  Depper Law Firm, 101 West Main Street, Suite 200,
9  El Dorado, Arkansas, at 1:45 p.m., pursuant to the
10 notice hereinafter set forth.
11
12         S T I P U L A T I O N S
13
14    IT IS STIPULATED AND AGREED by and between
15 the parties through their respective counsel that
16 the oral deposition of REID SCOTT HUMPHREY may be
17 taken at the time and place designated pursuant to
18 the Federal Rules of Civil Procedure.
19
20
21
22
23
24
25

28

1  Q. Ongoing, things like diabetes, heart
2  disease?
3  A. No, ma'am.
4  Q. Okay. When is the last time you saw a
5  doctor?
6  A. I think would probably be around 2000, 2001.
7  Q. So you -- let's talk about the incident.
8  You say the officers beat you up. What were your
9  injuries?
10 A. Soreness, and I guess just the idea that I
11 don't trust anybody anymore.
12 Q. Were you particularly trusting before that?
13 A. Yes, I thought I should trust everybody.
14 Well, pretty much everybody, but the last thing
15 you expect is that police officers are the ones
16 that you're not going to trust.
17 Q. Okay. Even though you have had prior
18 encounters with law enforcement.
19 A. I have always been cooperative with them.
20 Q. When you say soreness, where were you sore?
21 A. My leg was sore, my -- the space between my
22 fingers were sore, because they tried to rip my
23 fingers apart, and the backside of my head.
24 Q. The backside of your head?
25 A. Yes, right in here.

1  Q.  And what do you believe that to be a result
2  of?
3  A.  Being hit.
4  Q.  So any cuts, any bruises -- any cuts?
5  A.  No cuts.
6  Q.  Any bruises?
7  A.  Left thigh.
8  Q.  Did you document in that in any way, take a
9  picture or anything?
10 A.  No, ma'am.
11 Q.  Okay.  So you didn't see a physician after
12 this?
13 A.  No, ma'am.
14 Q.  And when I say any health issues, you
15 mentioned Ms. Talley has some mental health issues
16 and things like that.  Do you have anything of
17 that nature?
18 A.  No, ma'am.
19 Q.  So you have never seen a counselor,
20 psychologist, psychiatrist?
21 A.  No, ma'am.
22 Q.  All right.  Now, you have sued my particular
23 clients for -- on a claim failure to train,
24 failure to supervise.  Are you familiar with the
25 training policies of the El Dorado Police

1  Department?
2  A.  No, ma'am.
3  Q.  Are you familiar with the supervision
4  policies of El Dorado Police Department?
5  A.  No, ma'am.
6  Q.  Are you familiar with any of the policies of
7  the El Dorado Police Department?
8  A.  No, ma'am.
9  Q.  So you couldn't tell me which policies you
10 think they violated?
11 A.  No, ma'am.
12 Q.  And when I say they, I mean the officers or
13 my the chiefs, the current chief and the former
14 chief?
15 A.  No, ma'am.
16 Q.  Do you have a belief or an assertion as to
17 how the officers weren't trained properly?
18 A.  I do not.
19 Q.  Same question. Any sort of belief as to how
20 they -- my clients failed to supervise the
21 officers?
22 A.  Well, I believe that the supervisor is the
23 one that grabs you, and there is some supervision
24 problems.
25 Q.  When you say the supervisor is the one that

1  grabs you, are you referring to Darren Martin?
2  A.  Correct.
3  Q.  So your issue with the supervising is the
4  way that Sergeant Martin handled the situation?
5  A.  Yes, ma'am.
6  Q.  Okay.  How did you know that he was a
7  supervising officer?
8  A.  I didn't at that time, except for the fact
9  that he was really acting as if he was in charge.
10 Q.  Okay.  And so just to clarify, my client,
11 Chief White was not present at that incident?
12 A.  No, ma'am.
13 Q.  He wasn't personally involved?
14 A.  No, ma'am.
15 Q.  Same question.  Captain Roberts, he wasn't
16 there at the incident?
17 A.  No, ma'am.
18 Q.  Wasn't personally involved?
19 A.  No, ma'am.
20 Q.  Were there, other than you, Ms. Talley and
21 the officers, were there other people present
22 during the incident, guests of the hotel, perhaps
23 off camera that you cannot see?
24 A.  No, ma'am.  The people in question were the
25 ones that called in the report, and after the

1   A.   I owe him nothing.
2   Q.   How much did you pay him?
3   A.   In all, I paid him 16 -- 1660 for
4   representing me and a thousand dollars for
5   representing Felicia.
6   Q.   When you say 1660, do you mean 1,660
7   dollars?
8   A.   Correct.
9   Q.   And is it Mr. McDonald?
10  A.   Yes.
11  Q.   What is his first name?
12       MR. DEPPER: Gary.
13       THE WITNESS: Gary. Sorry. I
14     forgot.
15  BY MS. LAFEVER:
16  Q.   And he is who defended you in the criminal
17  matter?
18  A.   Yes, ma'am.
19  Q.   But Mr. Depper was there as well?
20  A.   Yes, ma'am.
21  Q.   And just to cover my basis, this is going to
22  be kind of a weird question. The mayor of El
23  Dorado, he wasn't personally involved in the
24  incident with you?
25  A.   No, ma'am

1  Q.  You never complained to the mayor about what
2  happened?
3  A.  No, ma'am.
4  Q.  How about the city counsel, did you send any
5  complaints to city counsel members?
6  A.  No, ma'am.
7  Q.  Did you complain to the police department
8  about this incident, Mr. Humphrey?
9  A.  No, ma'am.  I contacted Gary McDonald.
10  Q.  So your first call was to the lawyer?
11  A.  Yes, ma'am.
12  Q.  Why didn't you complain to the police
13  department?
14  A.  They're the people that beat me up.
15  Q.  Okay.  So you didn't think they would be
16  receptive to your complaint?
17  A.  If they're going to come and beat you up,
18  who can you trust?  So I had a trust issue
19  immediately.  I know I can trust a lawyer, and I
20  brought Mr. McDonald over to the hotel and I
21  showed him off the projector.  I showed him the
22  DVD, and he just advised me that is not right.
23  And I said well, okay.  And we went from there.
24  Q.  Okay.  Have you ever come -- the reason I
25  ask is so -- say I have a complaint about

1    before finally relocating.
2    Q.   Do you have a contractor's license,
3    Mr. Humphrey?
4    A.   No, ma'am.
5    Q.   In any state, Florida or Arkansas?
6    A.   No, ma'am.
7    Q.   Now, so you said that you didn't make a
8    complaint to the El Dorado Police Department, that
9    you called your lawyer first; is that correct?
10   A.   Correct.
11   Q.   So in order for my clients, the former chief
12   and the current chief, to know about the
13   situation, to discipline the officers, if
14   necessary, isn't it fair that they need to know
15   about it first?
16   A.   I think my lawyers thought if they needed to
17   know he would explain that to them.  Like I said,
18   I am not from this area.  I hadn't been here,
19   what, August, September, I had been here six
20   months and already I am beat up, so it is like I
21   don't know what this is all about.
22   Q.   So when you say your lawyer, do you mean
23   Mr. McDonald?
24   A.   Mr. McDonald.
25   Q.   So you believe that it was Mr. McDonald's

1   Q.   So, if my clients don't know that there is a
2   problem or a potential problem, then it would be
3   fair that they wouldn't know to fix something?
4           MR. DEPPER:  Object as to form.  Go
5       ahead.
6           THE WITNESS:  Well, I don't know
7       how deep the problem is.  You know, that
8       is why I said, I went to find somebody
9       that I could trust.  And I don't know
10      who the chief of police is, and I don't
11      know if this is common.  I don't, you
12      know, if this is just my looking.  Of
13      course if you look at television you see
14      all of these kind of things come up
15      every once in a while, because that is
16      what television is all about, but until
17      you have actually lived it you don't
18      know.
19  BY MS. LAFEVER:
20  Q.   But would you agree with me that in order to
21  correct a problem of any kind, just correct a
22  problem, you must first must know that there is a
23  problem?
24  A.   I agree.
25  Q.   And in order to know that there is a

1   problem, there has to be something to -- somebody
2   has to tell you, or there has to be something to
3   give you notice that there is a problem?
4   A.   Yes, ma'am.  But my understanding, or what I
5   do not understand is why it took so long for the
6   problem to surface, because the problem was
7   already there, and Sergeant Martin already knew
8   the problem was there.  Within two days of the
9   incident, he had gone to the hotel, he had viewed
10  the tape.  And he did not give that information to
11  the police department?  So, that is what is scary.
12  Q.   But with regard to the chiefs --
13  A.   Uh-huh.
14  Q.   -- not Sergeant Martin, if they don't -- if
15  nobody -- if it doesn't get to the chiefs, and
16  they say, you know, somebody said you come in and
17  you complain, hey, I don't like how your officers
18  treated me.  I think they beat me up.  I think
19  they used too much excessive force.  You did not
20  do that, correct?
21  A.   I did not.
22  Q.   Okay.  Mr. Humphrey, did you try to bite one
23  of the officers?
24  A.   I did not.
25           MS. LAFEVER:  That is all I have

1   A.   Yes, I believe that is it.
2   Q.   Okay. Is he still employed there at the
3   Econo Lodge?
4   A.   He is.
5   Q.   And is it still the Econo Lodge?
6   A.   It is.
7   Q.   Was it the Econo Lodge at that time?
8   A.   It was.
9   Q.   Okay. Now, so you were taken to jail on the
10  evening that you were arrested; is that correct?
11  A.   That is correct.
12  Q.   Did you complain to anyone at the jail that
13  you were injured?
14  A.   I actually -- I think it was Officer Snell,
15  on his way out I had explained to him that the
16  handcuffs were cutting off my circulation, and
17  could he please loosen them, and at that time he
18  did, but that was the only.
19  Q.   Okay. So when you complained to Officer
20  Snell about the handcuffs being too tight, his
21  response was that he did loosen them; is that
22  correct?
23  A.   That is correct.
24  Q.   All right. Did you complain to any jail
25  personnel about being injured on the night of the

1   incident?
2   A.   I did not.
3   Q.   Okay.  Have you sought any medical treatment
4   of any kind whatsoever regarding the incident?
5   A.   I have not.
6   Q.   Have you sought any type of psychological
7   counseling, counseling with a minister, pastor,
8   anybody like that as a result of this incident?
9   A.   I have not.
10  Q.   You mentioned that you spent, and I want to
11  clarify something, I wrote down two things.  You
12  paid 1,660 dollars to an attorney named McDonald.
13  I think his first name is Greg; is that right?
14  A.   Gary.
15  Q.   Gary.  Okay.  16 -- 1,660 dollars to a Gary
16  McDonald; is that correct?
17  A.   That is.
18  Q.   And then you mentioned a thousand dollars of
19  that was for Felicia?
20  A.   No.  An additional thousand dollars was for
21  Felicia.
22  Q.   All right.  So to be clear, you -- or your
23  testimony is that for representation solely with
24  regard to the charges that were filed against you,
25  you were saying that you paid Mr. McDonald 1,660

79

1   22:14:54 the officers stopped striking you. And
2   then you began describing some things. And I
3   would like for you, if you can, in the best of
4   your ability, explain to me what your talking
5   about.
6   A.   Well, all three of them had ahold of me.
7   All I know is that one of them was twisting my
8   wrist.
9   Q.   Okay. Fair enough which wrist?
10  A.   It would be my right one.
11  Q.   Okay. And you said -- well, and I don't --
12  you were indicating something with your fingers?
13  A.   Another one was separating my hand, my
14  fingers on my left hand while they were trying to
15  cuff me.
16  Q.   Okay. So, would it be fair to say that it
17  was at that point at 22:14:54 that they had
18  control of you?
19  A.   Yes.
20  Q.   And that is why they stopped striking you?
21  A.   Yes.
22  Q.   All right. How long were you in jail?
23  A.   Overnight.
24  Q.   Were you released on your own recognizance?
25  A.   No, I was bonded out.